You can proceed. Your Honor, good morning. I trust you have been given my little notebook that I may refer to from time to time. It's a few handouts of pictures from the briefing. Is all this in the record that's in this? It should be in the record, Your Honor. I hope it is. I'm confident. So these are excerpts from the record? These are excerpts and pictures from the record in our briefing. And the last two items, I'm sorry, items 8 and 9 are new cases that I wanted to bring to the Court's attention, one written by Justice Higginbotham and the other one written, a Lambert case, on the navigations of sovereignty that the Corps of Engineers has. And those two cases were in your brief? No, I'm sorry. The Butler was in the Appellee's brief, and I wanted to bring it to the Court's attention. Lambert was not, and that's why I'm attaching it separately. But it's an important case, and I wanted to bring it to the Court. Is that in here? You said attaching it. Is it in here? It is in this notebook. It is tab 8. So first of all, my name is Ben Brooks, and it's an honor to be here again, particularly on this case. This is a case that's going to have international consequences. It may not seem like that while we're sitting here, but it is. This has everything to do with who's going to control the production and shipment of oil and gas from the Permian Basin over to our European allies. That's what this case is about, because Enbridge, who I do not represent, has the single largest facility on the Gulf Coast for shipping goods, shipping petrochemicals. They cannot bring very large crude carriers and large crude ships in unless they dredge their docks and harbors. They cannot dredge unless they have a place to put the dredge spoils. Two sides of the same coin. This is a case in which I don't represent Enbridge, but they are targeted. I don't represent the Army Corps of Engineers, but they are targeted. And their exclusion was purposefully to take my client, who has done nothing more than own a small island, which is the only competitor to the port in the Corpus Christi ship channel where dredge spoils can be deposited, that the Army Corps of Engineers specifically said dredge spoils will be deposited there from Berry Island into the navigable waters of the United States. Those are directives. Those are commands, if you will. They're not suggestions. And on that basis, we removed the case in part because of the federal officer provisions of 1442, because, first of all, the action was not taken against the Corps, but it was directed to the Corps, a separate basis in the preamble to 1442. Secondly, we were acting pursuant to a directive of the Corps. It couldn't get any more specific than you will put these on Berry Island. I'm sorry, Steve. This permit, which I'm looking at now, that was gotten by Motor Ingleside Oil Terminal, was that there at request of Motor, was it not? I mean, this is not work being done for the Corps of Engineers. This is work being done authorized by the Corps of Engineers, correct? I'm not trying to make a legal distinction yet. Who initiated this permit? Your Honor, the permit itself on the record is between Enbridge and the Corps. I know, but who initiated it? Didn't Motor go to the Corps to get the permit? It's been one of us in a long series of permits. Well, regardless. It's not the Corps looking for people to deepen the ship channel. I don't think that's right. I think in the WERDA Act, if you look in the corpus, now, opening brief, we cite the provisions of the WERDA that specifically designate the Corpus Christi Ship Channel as congressional targets for the deepening for which they authorized $130 million for the Corps of Engineers to supervise exercising specifically the navigational sovereignty, the navigational, drawing a blank. You know what I mean. But that was specifically congressionally mandated. So I don't know that that's fair to say that this was not something that the Corps had nothing to do with. They were passive recipients. They were specifically commanded by Congress to deepen the Corpus Christi Ship Channel for these exact reasons. Well, this says to make improvements to berth 2A with the existing east basin. It seems to me as if this is adjacent to the shoreline and deepening or otherwise addressing the need for navigation and for berthing of ships, no? Yes, it is. As opposed to navigation through some ship channel that the Corps of Engineers may have been. Anyway, proceed, proceed. I apologize, but I want to direct your attention. This is not our permit. Right. But we are named in the permit. It says in the, this is in tab, I've highlighted it, tab 7. It says all dredge material will be placed on Berry Island. Now, even more importantly, noting the fact that this is not our permit, why would the Corps of Engineers specifically command dredge spools be placed on our island? Why not say in Lafayette Square? I mean, how random would that be unless there was some inferred relationship, which they did not challenge in the trial court. That was not a challenged fact. They, meaning the Port Authority, they did not say. In fact, they disclaimed any. Well, you are making this an extraordinarily important case, and it is for the parties, but the global ramifications that you may be pushing too hard, it seems to me that a permit was gotten by MOTOR from the Corps to do certain work relevant to facilities adjacent to the shoreline, and it had already been worked in advance that you would put this spore on, spoil, spore, I guess it is, on Berry Island. I mean, it is just a place to put it, but how does that help you in deciding your rights to otherwise cause some of that to get into a place other than Berry Island? That is the whole point. They instructed us. This is the construction of dredge material placement areas, DMPAs, and I have got in tab three, I think I have got, there is inland, there is coastal, and then there is offshore facilities, and the Port of Corpus Christi controls all of them but my clients. This is a monopolistic play. But the Corps specifically said you will deposit this dredge spoil and said certain effusions could come over the weirs and allow the water and the solids to go back out into the national servitude that the Corps has. Now, that is navigable waters. It is not about the subsurface. It is about where the material was coming out into the Corps' navigable waters. So it is a misdirection play, in my opinion, to suggest that the solids came directly off Berry Island and landed on the floor of the subsurface. That did not happen. We went into the waters, the navigable waters of the United States, as directed by the Corps. In fact, the Corps even told us how many parts per milliliter we could have of solids, which the Port of Corpus Christi would like. Stay in the center. This is being recorded. Get away from the microphone. We may lose some of your words. Oh, you won't do that. I would not want to do that. But the point is that if this court does not exercise control over this, what that means is that every county court at law, from Brownsville over to the end of Mississippi or Louisiana, is going to have their own say as to what can and can't be deposited into the navigable waters of the United States. It takes the Army Corps of Engineers navigable servitude, which controls for the nation, our commerce, and puts it in the hands, it balkanizes it. That's what it does. And that's why this is a federal officer question, because we were acting at their direction, but totally separately. We have federal questions. There was a side of Judge Owen wrote the Tennessee gas opinion in which she laid out from Grable the basic steps you have to satisfy to prove that you have a federal question. We have more than ample evidence, although we didn't have the burden of producing most of this because it wasn't challenged, but we did. Let me get on to just federal jurisdiction. So the record evidence you would point to for your reply brief statements that you were directed by the Army Corps, that your client was directed, is just the permit or is there more? Well, Your Honor, that's an interesting question because the evidentiary burden, as I understand it, and it's clear to me, is that we didn't have to actually substantiate anything unless it was challenged by the court, by the port. Then we had the burden of coming forward. Otherwise, it's just Rule 8 standards of a plain and simple statement. So they made a specific statement that said, and I've quoted it in our briefing, that they're not challenging the status of Barry or his relationships with the Corps of Engineers. So there was no need on our part to try to go in and substantiate the relationships as they might have been. Now, we did substantiate the fact that the Corps controls everything from how these DMPAs are constructed to how they're maintained. The Corps inspects them. The Corps tells you what you can and can't put in. You can't sell them without their approval. It's from soup to nuts. The Corps of Engineers controls everything. This is exactly what St. Charles was all about. The supervision, guidance, and control of the Army Corps of Engineers and Judge Higginbotham, in your opinion in the rural utilities case, you pointed out where the Rural Utilities Commission was adopted to provide electricity to people in the rural areas, and they put loan agreements out that the co-ops borrowed and affirmative and negative covenants was enough of a connection to create a federal question. And this is vastly more of a federal connection than was in the RUS case. In St. Charles, we remanded to ascertain after our en banc decision if there had been guidance and direction. There were two St. Charles cases. One of them was, as you say, the second one was remanded because the plaintiff inadvertently included something in the files. They tried to disclaim any federal patients and inadvertently produced federal patients, and so this court said, well, are you or are you not claiming for federal patients? And that was in 2021. Back to my first question. What do you point to besides the permit that describes Berry Island as a receptacle? What do you point to as anything that displays Army Corps action as to your claim? Well, Your Honor, our opening brief sets forth 30 or 40 CFR regulations that we were required to comply with. I mean, we set forth the requirements that are imposed on Berry Island as a DMPA. I mean, we documented that, as we would say, in spades. Being regulated isn't enough, correct? It's not enough. But the line between being regulated and when you go from being regulated to when you're now under the supervision, guidance, and control of the court, that's a very interesting line. And cases would try to, in hindsight, try to draw a line. Clearly, but sometimes it can be. But the critical issue here is this 1442 is to be liberally construed. Now, that is superimposed on the other requirement when they amended the Removal Act to make it anything related to. So you've got liberally construed and anything related to a directive from a federal government agent. You know, the cases say, well, you don't put your thumb on the scale. Well, that's not right. You actually do put your thumb on the scale. It's on our side. You're supposed to liberally construe our allegations and our pleadings to try to find 1442 because it's designed to protect people that are trying to help the federal government in some related way from being hauled into county courts at law up and down the Texas and Louisiana and Mississippi Gulf Coast. We have a right to come to an Article III court not because these justices are not smart and all that, but, you know, Congress has dictated that we have a right to an Article III tribunal to adjudicate these issues for this reason. And that's why you're supposed to liberally construe this, not parsimoniously. And so we have asserted federal officer jurisdiction, liberally construed. We've shown that we were acting certainly related to directives given by the court. We certainly were. We were acting to facilitate their implementation of the national servitude. And these permits are issued after intensive community meetings. They'll have environmental assessments and analyses that the court undertakes to decide where this stuff's going to go. That's not some willy-nilly place, put it over there next door. No, they have to do environmental impact analyses. The community comes and has an input. Or you can just let the county court at Law No. 4 decide it. And I say that obviously tongue-in-cheek, but that's the choice that we're given. So we have federal question jurisdiction, and we've established that. Now, I'm not going to have time at this point to get into the maritime. We did address that. We believe that the amendments in 2011 give us the ability to have a third ground that this court has not addressed, but it's a hot issue. Do we have maritime jurisdiction? We think we do. We think with the amendments that were adopted in 2011, I don't know how to do anything other than read the plain wording of a statute. And that plain wording of a statute took out the critical length. And it's only two or three sentences. And how one can gerrymander that to say something other than that diversity is now no longer required. As long as you have a maritime claim, you can get into federal court. And I believe we would contend that's the effect of those 2011 amendments. So we believe we've established more than enough evidence to bring our case into the federal courts and reverse this remand. And I'll reserve the rest of my few seconds for another vote. Thank you all. Thank you, sir. May it please the court. The district court properly remanded these state law claims because the Berry parties did not meet their burden, and it was their burden, to establish removal jurisdiction under any of the three grounds asserted. Starting with the federal removal officer statute, Berry did not meet its burden to show that it was acting under a federal officer. It was not assisting the U.S. Army Corps of Engineers or helping it to carry out an official duty. There's no factual allegation or evidence of any delegation, formal or otherwise, of a duty owed by the Corps. What would you say is in the record about explaining this permit, its purpose, the role the Corps had in it, et cetera? I'm sorry, could I explain the permit and the role the Corps had in it? Yeah, explain, getting into for whom are the defendants acting? At what direction might they be acting responsive to the Corps? So explain this permit to us, and what do you say, where does it come from, and what is the role of the Corps other than issuing it? Yes, Your Honor, and to your question, to my opposing counsel, this was done at MODA's request. This is not, and I think this is a crucial distinction of this case, this was not the Corps dredging or contracting out its own dredging and needing a place to dispose of it. This was MODA filing a request for a permit under 33 CFR Appendix A to Part 325. That's a form application that the Corps provides, and MODA, and it's in the permit itself, wanted to dredge in order to expand its own private docks and berths at its terminal facility for its own purposes. So, and as this Court said, in Erlequid v. U.S. Army Corps of Engineers in 2004, permits are one of the ways in which the Corps regulates, and that's what it was doing here. It was taking away the regulatory bar to MODA's desired activities, and just as in the Watson v. Philip Morris case of the U.S. Supreme Court, nothing warrants treating that relationship here as distinct from the usual regulator-regulated relationship. Isn't it distinct in that it specifically directs that a particular site receive the dredged material? Your Honor, I don't believe that's correct. The MODA filled out the application, and MODA had to fill out the project description, and MODA is the one that said, because it had an easement with Berry, that it would be depositing on Berry Island. But crucially, the next sentence says that dredging material can also be placed on other DMPAs. And even more importantly, nothing in the federal permit, and I disagree with my opposing counsel on this, nothing in the federal permit directs the discharge of any of those materials into the navigable waters, much less directs that they be placed on the port's submerged lands in those waters. That's why you didn't sue MODA? You're right, Your Honor. We didn't sue MODA because Berry is the one that controls all activities on the land. MODA merely has an easement, and Berry could effectively conduct the same conduct if we had not. In this context, MODA would be a federal contractor? No, Your Honor, I don't believe that's right. I think MODA, I think Berry is not even the regulated entity. Berry is not the permittee, and to your question earlier, all the regulations that Berry has cited apply to the dredging party, and indeed the focus of the permit is on the dredging itself, and that's what most of the specificity is about. So even if we had sued MODA, there still wouldn't be federal officer removal jurisdiction because what the permit does is merely remove the regulatory bar and, as the case law has said, leave the defendant to its rights at common law. And the permit, and this is boilerplate language from the Corps' application, and the permit says it's not creating property rights, it's not authorizing damage to property rights, and it even requires MODA to get a land-use agreement with the Port for mitigation activities that were going to occur on the submerged lands. Do we have to accept that, that MODA itself isn't a federal officer? Or is that necessary? I don't think it's... Oh, I'm sorry. Well, it's just I'm thinking we, for better or worse, we tried to tackle the line in Latiole, and we loosened it, it appears, and we've now, subsequent to that, said we're really looking for whether there's a relationship. Well, it's hard to deny that Berry Island defendants have a relationship to MODA's arrangement with the Army Corps. Well, the... Latiole's, as I understood it, was dealing with the fourth element of the test, which is does the challenge conduct relate to federal officer directions? And so I don't think you even get there because there was no acting under a federal officer for MODA or much less Berry, Your Honour. And, um, let's see. I think I would also say that Berry argues that we've challenged the... that we've expressly disclaimed any challenge to the permit or compliance with the permit, and that is correct. We did not concede that Berry has the requisite relationship with the Army Corps of Engineers, of course. And this court said in St. Charles Surgical Hospital versus Louisiana Health Service and Indemnity Company that it would accept expressed disclaimers absent evidence of artful pleading to avoid federal jurisdiction, and there's no evidence of that here. If anything, our state law trespass claim is fully consistent with the permit because, again, the permit doesn't regulate the discharge into the waters or require depositing on our land. And, indeed, our Second Amendment petition, which is in the record, says that we are not trying to enjoin all depositing of material on the Berry Island DMPA. Instead, we're challenging the manner in which that is done that causes sediment to settle on our land, something that the permit says nothing about, much less directs anyone, Berry or anyone else, to do. I don't know how it would relate, actually, to whether to remand or not, but just you raised it. Is there anything about the DMPA process, at least if that's an island out in a waterway, where it's just in the nature of how the hydraulics work of the water and the sediment or whatever, that it does ooze out and go away from the island after it soaks in? If you go to any DMPA as an island, would you find this same buildup? Is there anything in the case about that? Again, I say I'm not quite sure how that would affect anything, but I just wonder if this is a surprising, unusual development that on the adjacent land there's a buildup of sediment. Your Honor, to your question, no, you could deposit on DMPA and retain all the dredging materials on the DMPA, but you could also discharge... You could also allow the sediment to settle and discharge filter water, which is how people do it. Again, the federal permit doesn't speak to that, but those are the two ways. You're saying the process is not supposed to create sediment if it's properly managed on the adjacent subsurface. Yes, but it's not supposed to cause the buildup on our submerged lands that caused it to create a sandbar and sometimes above the waterline. I know the permit doesn't authorize it, but I'm just wondering if just the physics of how this works, it's always going to be doing this. No, Your Honor, that's not our allegation, and again, obviously... It wouldn't be your allegation. It would be sort of their defense, I guess. Well, but federal officer removal jurisdiction, like most removal jurisdictions, is determined from the petition and our claim, not... I'm just talking about the physics of it. I'm not sure it has any effect on removal, but we're talking about what's happening on that island. I just want a better understanding of why it's happening on that island. Yes, Your Honor, our allegation is that they are doing it improperly in a manner that causes too much sediment to be released and to pile up on our submerged lands. And indeed, Barry itself has brought up the fact that the Corps is investigating a complaint that there has been excess discharges of sediment that's affecting seagrass. So I think there are allegations in this case that it is being done improperly. If that answers your question. Then go ahead. OK. And so I would say that also, you know, to the point that the permit doesn't purport to preclude the state law claim here, I mean, I think nobody treated the permit as establishing a right to invade others' property. Barry itself entered an easement with MoDA that specifically referenced the permit. It did not think that the permit itself gave it a right to give MoDA the right to come onto their land without paying a fee pursuant to the easement. And the same is true as to our property. Nor have we ever sought to implicitly or explicitly enjoin the Army Corps of Engineers. Of course, we didn't sue the Army Corps of Engineers. We never requested any injunction against them. The best Barry comes up with is that we referred to anyone acting in concert with Barry. But of course, we never alleged that the Corps was acting in concert with Barry. On the contrary, we've argued to the contrary. On federal question jurisdiction, Barry has also not met its burden to establish that. Originally, they had argued... The most common type of federal question jurisdiction is the federal law creates a cause of action. Barry originally argued that, but has dropped that claim in this court. And they're unable to identify a dispute, a substantial issue of federal law that is necessary to resolve the trespass claim here. The Second Amendment Petition, nowhere in it does it assert any violation of federal law or duty, much less predicate recovery on its trespass claims on such federal law. And I think that distinguishes all of the cases that Barry relies on. Board of Commissioners v. Tennessee Gas, Nicodemus v. Union Pacific Corps, Grable & Sons v. DeRue Engineering, and now Butler. All of those involved parties... And excuse me, I'm confusing Butler. But those three cases, all of them, the plaintiff expressly alleged a violation of federal law and expressly premised their state law tort claim recovery on that federal law. And we just don't have that here. I would like to speak to Butler, and I should have mentioned it in my federal office removal discussion. Butler, as this Court explained in the recent Box v. Petrotel case, Butler involved something... The defendant was an instrumentality of the U.S. government, and it was performing a task that the federal government would have had to otherwise perform, which was providing affordable electricity to rural areas. So that fit very neatly into the Watson test for assisting the federal government in helping it to carry out an official duty, and we have nothing like that in this case. Again, there was no dredging by the Corps or under a contract with the Corps. Let me ask you, as far as the record is concerned, that last statement I think is quite important, which is this was not being done at the direction of the Corps. I want to make sure that the record actually supports that. Is that a matter that if that is going to be the allegation that was upon the plaintiffs to show that that is the case? I mean, when I just look at this permit, I can't say one way or another what it means. So what do we know about what is in the record now beyond the permit that would get into the background of the permit so we could decide that this is not being done at the direction of the Corps? Or is it a matter that there has not been a sufficient allegation of that? Right. I think Your Honor has the petition and the permit. I mean, this case was removed shortly after the petition added the state law trespass claim. And recall that originally this case was just a name infringement and dilution, which Barry has never alleged, raises the question of federal jurisdiction. So it was removed very shortly after the trespass claim was added and before the injunction hearing in the county court at law. So what you have is the allegations of the petition and you have the permit, and neither one of those shows the requisite level of direction, subjection by the Army Corps of Engineers to Barry or even Mota. I mean, if that were the case, then it would mean that every permit that the Corps issues... Because, again, this is a standard form permit that the Corps approved, that every permit would give rise to federal jurisdiction, and really I think it would collapse. It would give rise to a question about federal jurisdiction that could be resolved once you figure out what the permit's about. I mean, I don't know what a permit... If the Corps actually wanted the work done, if this was a permit to dredge something at the direction of the Corps, I don't know at this stage what that permit would look like and what it would say to tell us it's at the direction of the Corps as opposed to what this permit says. So I see this more as a question of the record, not a question of we're going to open the floodgates to every permit is now a federal officer or federal jurisdiction matter. Well, I say that because I don't believe that the permit supports that. The permit doesn't support that assertion in this case as a factual matter. But I think the way that the Corps does when it does its own dredging, it has a federal contractor. It has a contract, not a permit, and that's what's happened in the past when the Corps has wanted to do its own dredging for navigational purposes as opposed to allowing, removing the regulatory bar to a private individual to dredge for its own commercial interests. Was there earlier removal litigation in this case? Do I remember that from the briefing? Your Honor, there was a separate case between these parties, the Good Hope case, in which the Berry parties were complaining about the port operation of a DMPA on Good Hope, and we had removed that, and I think we had pointed that out in the brief that Berry took the opposite position to the removability of similar claims in that case. But it was not in this incident case, Your Honor. I would also say on federal removal, I'll just add that I don't believe there's— you could also independently decide this case on the no colorable federal defense. Again, they were not acting at the direction of the Corps, but also a lot of their defense is that there's no recovery under state trespass law because Berry owns the accretions as owner of Berry Island. I think fundamentally that's a Texas defense. They're citing Texas law for that. I would also submit it's wrong as a matter of Texas law, as the Natlin v. Bakersport case said, but it's not a federal defense colorable otherwise. I'd be happy to address maritime jurisdiction if the Court— I can briefly summarize our position on that, because that is the third ground for removal that the Berry parties have asserted. I think the Court can decline to reach that because it hasn't been briefed in any detail, but if the Court does reach it, I think the rule is as it has remained for the hundreds of years, since 1789, that maritime claims that are brought under the Saving to Suitors Clause of 1333-1, seeking common law remedies in state court, that those are not freely removable absent an independent basis for removal of jurisdiction. The 2011 amendment to 1441B did not sub silentio overrule that Horry precedent, as the vast majority of cases in this circuit has held, including the Ryan Court that initially thought otherwise but then changed course. No other circuit that has directly confronted this argument has held to the contrary. There are cases from the Fourth, Seventh, and Ninth Circuit. They were all determined on the basis of waiver. And I think the reason that this amendment doesn't affect anything is that it's the Savings to Suitor Clause that prevents the removal of maritime claims, and nothing in that clause has changed substantively since 1789, as the U.S. Supreme Court said in the Romero v. ITC case that the Savings to Suitor Clause was intended to preserve the traditional longstanding concurrent jurisdiction of state and federal courts over common law remedies for maritime claims. And in Barker, this Court said that it was the Savings to Suitor's exception to original administrative jurisdiction, that such are cases of law that are not removable within 1441A, regardless of any changes to be. And as Judge Higginbotham said in his dissent in Barker, the 2011 amendment was merely a clarification to be that the home defendant constraint only applied to diversity cases. And that's consistent with the legislative history, which showed it was only intended to clearly delineate between federal question cases and diversity cases and to enable litigants to find where in the statute that was contained. And I think holding maritime claims freely removable would eviscerate that clause, which was the very thing that the Romero Court warned against. And I think when you consider the principle well established that there is strict construction of removal statutes beyond the federal officer removal statute, and Romero's admonishment that jurisdictional statutes must be read in their setting and history and practice and with due regard to the consequences of the construction given them, there's no possible way to consider the 2011 amendment to silently overturn hundreds of years of precedent recognizing Congress's intention to preserve the concurrent jurisdiction of state and federal courts. I respectfully request the Court to affirm the remand order. Thank you, Your Honor. Thank you very much. Briefly, I'm going to address just a few of the points that my opposing counsel raised that I think need to be clarified. Number one, the vast majority of what was explained to you is not in the record. Mota did this. Mota did this. This is with the instance of Mota. That isn't in the record anywhere that I'm aware of. The vast majority. I can't say all, but the vast majority of it. Now, I want to address a few specific points about what they actually alleged. You would take my little notebook. This is just an excerpt from a brief. Look at page 11. I'm quoting from their brief. Page tab 11 and paragraph 112. It says, As long as Barry Island is allowed to conduct dredge placement activities, it will be a practical certainty that materials and substance will be discharged onto plaintiff's submerged land. As such, plaintiff's property rights are being inviolated unless joined in an offensive or bearable trespass. This is about nothing less than shutting a competitor down. That's what they said. They're not trying to regulate or control or say small amounts are okay. No. This is about closing it down. Look at tab 12. They did not challenge. I'm quoting from their petition, and their brief here in this case, rather. They say plaintiff is not challenging whether defendant Barry and or a party contracted with Barry are complying with applicable state-issued permits. Regardless of compliance with a TCEQ, USACE, or other permit, which plaintiff does not concede, the dredge placement activities on Barry Island have in the past resulted and in the future are practically certain to result in materials encroaching on their submerged land. That is a disclaimer that I don't have to come forward. Under this Court's binding press, US Supreme Court has said they aren't challenging these things that the Court is properly asking now because you're curious. They didn't raise these things. And so there's many questions that Your Honor was asking that the burden wasn't on us because they said we're not challenging that. And I don't know how that can become now overlooked. The other thing that I'd like you to look at is the actual tab, I guess it's 9 or 10 rather, which is the scope of the injunction that they seek. I'm reading their petition. The POCC asks this Court, the county court at Law No. 4, to enter a TRO and then ultimately a preliminary injunction and then a permanent injunction prohibiting Barry, his officers, partners, agents, servants, employees, and those in active concert with them in the course of any dredged material placement activities from causing, commanding, allowing, requesting, instructing, or otherwise permitting the discharge of any materials or solids from Barry Island. Now, how does that not relate to the Corps? The permit itself that we've been talking about, on which there is no detailed record having been established, specifically says the Corps directs that these deposits will be placed on Barry Island. Now, you can frame that any way you'd like as an advocate, but the language says all dredged material will be placed on Barry Island. Now, how is that not commanding? How is that not permitting? How does the Corps of Engineers, and we're not talking about a monolithic entity here, we're talking about when the Corps of Engineers has to make this decision, you're going to be talking about two or three people sitting in a room saying they want this to go to Barry Island, and one of them is going to say, I don't want to get hauled in the county court at law number four. That would scare a lot of people. And so the chilling effect, and we'll never know, because to get any kind of evidence from the Corps of Engineers, why did you do this, you have to go through the tour, request, that is a very challenging process, to say why did you do what you did, why did you not do what you did. That will be an insurmountable hurdle for anybody in my position trying to say you wouldn't designate Barry Island anymore because you were afraid, right? I will never get to ask that question as a practical matter. But let's read on, because the very next sentence contradicts what she told you. After having said dredged material will be placed on Barry Island, it said permitted potential dredged material placement areas, DMPAs, for any future dredging, including maintenance, will include all federally authorized and constructed upland confined dredged material placement areas. And it lists a few. That's for the future. This was a very specific permit about a specific place, and this injunction is designed to put nothing less than a chilling effect on the Corps of Engineers to put a competitor out of business. Now, the second page says, if conditioned water quality certification has been issued for your project, then you must meet those certifications. The TCEQ was consulted. The TCEQ was consulted by the Corps for the purpose of deciding precisely how much solid could come off that island. And that's what the restriction was. Now, is there anything that says sandbars won't be developed? No. But there's nothing that says one way or the other. It just simply says, because all you're really doing, Your Honor, is taking dredge spoil from the motor docks, now Enbridge, and moving it someplace else where it will be more beneficial to the environment. Your Honor, if we have time, you can... I apologize. I apologize. Thank you for your... Make a closing statement if you want, but you were... It looks like you were headed further than a closing statement. Sure thing. Thanks to both sides in wrapping up today's argument with this interesting case with enthusiastic arguments. And we are in recess until tomorrow at 9 a.m.